# Richmond.

Charles D. Fugate v. J. M. Weston.

March 19, 1931.

Present, All the Justices.

The opinion states the case.

*W. S. Cox, L. M. Robinette, W. L. Davidson, George P. Cridlin, Alfred J. Kirsh* and *Leon M. Bazile,* for the respondent.

*John R. Saunders, Attorney-General,* and *Edwin H. Gibson* and *Collins Denny, Jr., Assistant Attorneys-General,* for the petitioner.

Opinion of HOLT, J.

The original jurisdiction of this court is invoked in a petition for mandamus, filed by Charles D. Fugate, in which he charges "that on the 29th day of November, 1930, the Honorable John Garland Pollard, Governor of Virginia, by virtue of the power conferred upon him by section 366 of the Tax Code of Virginia, issued an executive order whereby he suspended J. M. Weston as treasurer of Lee county, Virginia, for reasons and causes set forth in said order, and therein commanded and forbade the said J. M. Weston from collecting any more taxes and public revenues for the State of Virginia and the county of Lee, from that date; and in the same order the said Governor appointed and commissioned him as the successor of the said J. M. Weston for the time of said suspension, with full power to collect the said taxes and public revenues of the said county of Lee and the Commonwealth of Virginia, with all powers and rights and duties as treasurer of the county."

Petition avers that he duly qualified as treasurer of said county on December 4, 1930, but that J. M. Weston, who had theretofore been elected its treasurer, had refused to comply with the executive order of the Governor and had declined to turn over said office and records as by that order directed.

Weston has filed a demurrer to this petition, in which he claims that section 366 of the Tax Code of Virginia, under which the Governor proceeded, is unconstitutional, because it

is in violation of sections 5 and 39 of the Constitution of Virginia,* relating to the separation and distribution of the powers of government. In short, it is said that this Tax Code section undertakes to invest the executive with judicial power.

Weston has filed no answer, but this stipulation, entered into on behalf of these litigants, appears in the record:

"That the audit of the accounts of J. M. Weston as treasurer of Lee county, made by the Auditor of Public Accounts as of May 17, 1930, shows that on that date the said J. M. Weston was indebted to the county of Lee in the sum of $99,322.11; that on that date he was indebted to the State of Virginia in the sum of $4,399.09; and that on that date he had in cash or in cash items the sum of $8,127.02. A subsequent audit of the accounts of the said J. M. Weston, treasurer as aforesaid, as of October 22, 1930, made by the said Auditor of Public Accounts, shows that on that date the said J. M. Weston was indebted to the county of Lee in the sum of $99,463.49; that on that date he was indebted to the State of Virginia in the sum of $323.07; and that on that date he had in cash or cash items the sum of $7,022.68.

"The sum of $323.07, shown to have been due to the State of Virginia by the said J. M. Weston as of October 22, 1930, was remitted by the said J. M. Weston to the Comptroller of the State of Virginia on November 13, 1930.

---

*Virginia Constitution.

"Section 5. Legislative, executive and judicial departments of State should be separate; elections should be periodical.—That the legislative, executive and judicial departments of the State should be separate and distinct; and that the members thereof may be restrained from oppression, by feeling and anticipating the burthens of the people, they should, at fixed periods, be reduced to a private station, return into that body from which they were originally taken, and the vacancies be supplied by regular elections, in which all or part of the former shall be again eligible, or ineligible, as the laws may direct."

"Section 39. Departments to be distinct.—Except as hereinafter provided, the legislative, executive and judicial departments shall be separate and distinct, so that neither exercise the powers properly belonging to either of the others, nor any person exercise the power of more than one of them at the same time."

"The said J. M. Weston became treasurer of Lee county on January 1, 1924, and was re-elected in November, 1927, at the general election held on the 8th day of that month for the term beginning January 1, 1928."

For the purposes of this case we shall assume that Weston has been guilty of gross malfeasance in office for which he may be removed by a proceeding under section 2705 of the Code, and also under said section 366 of the Tax Code, if this latter statute be constitutional. Weston's guilt or in-. nocence is not in issue here. We will assume that he is guilty. What we are to determine is whether or not this Tax Code section violates those fundamental principles of the Constitution of Virginia relative to the division and separation of the powers of government and their proper distribution among the legislative, judicial and executive departments thereof, for the urgency of the present necessity must not be permitted to override fundamental principles and dictate the decision of the question here presented. It is more important that they should be preserved than that some guilty officeholder should be removed from office.

In the instant case the Governor acted upon the report of an auditor whose record merits the utmost confidence, but there is nothing in the statute which requires that action be based upon so solid a foundation. Some executive, less mindful of the high obligations of his office, might be willing to act upon some partisan report made for political purposes.

When we come to weigh a statute, the question is not what has actually been done under it, but what might have been done. *Violett* v. *Alexandria,* 92 Va. 561, 23 S. E. 909, 31 L. R. A. 382, 53 Am. St. Rep. 825.

This Tax Code section gives to the Governor power to remove every city or county treasurer, clerk, sheriff, or other officer charged with the collection of any of the public revenues, and this without notice. Its terms are: "The Governor shall have power to suspend the treasurer of any county or

city of this Commonwealth, or other officer charged with the collection of the public revenues, from collecting the revenues of the State or of such county or city, for failure to execute and perform the duties required of such officer under the laws of the Commonwealth with reference to the collection of the revenue; and said officer shall not collect any further the revenues unless the General Assembly by joint resolution restore him to office. The collection of the revenues in such city or county shall then be made by the person appointed by the Governor for that purpose, and such appointee, after having qualified and given bond according to law, shall discharge all the duties of the office to which he is appointed during the time of the suspension of his predecessor, and shall be amenable to all the rules, regulations, requirements and responsibilities declared by the laws of this State pertaining to the collection of the public revenue."

It makes no provision for, nor does it permit, the accused officer to have the question of the existence of the cause of his suspension ultimately determined by a court. So far from doing this, the legislature has reserved to itself the right to determine if the action of the Governor is to be sustained. Since this right is reserved to the legislature, it cannot be exercised by the courts if this statute be constitutional, and it is for the legislature to say, without evidence and at pleasure, if the order of suspension is to be overruled. This suspension so-called is in substance a removal. The officer is displaced without provision for a determination of his rights anywhere. Unless the legislature, as a matter of grace, sees fit to reinstate him, he is out forever.

It is to be remembered that we are dealing here with a constitutional officer (Constitution, sections 110, 112), who was duly elected and whose term has not yet expired, and we are not called upon to consider the status of offices purely legislative.

It may readily be conceded that the Constitutional Conven-

tion, in framing our organic law, had power to confer upon the Governor and upon the legislature judicial power, but it was at pains in section 39 to say that these powers should not be interchangeably authorized except by authority written into the Constitution itself. Before any act of the legislature which purports to convey such authority can be sustained, it is necessary that it be possible to point out constitutional authority therefor. The presumptions are against it.

It may also be conceded that under the complex conditions of modern society it is not always possible to tell where the powers of one department end and those of another begin. Within this twilight zone incidental encroachments are at times unavoidable. *Winchester & Strasburg R. Co.* v. *Commonwealth,* 106 Va. 264, 55 S. E. 692. But such encroachments, unless authorized, must be incidental only. *McCurdy* v. *Smith,* 107 Va. 757, 60 S. E. 78. On the other hand, it is not necessary always to point to an express provision of the Constitution as authority when some act is unsupported by organic law. Private property cannot be taken for private uses in any circumstances, though it is not in terms forbidden.

In the case of *Farmville* v. *Walker,* 101 Va. 323, 330, 43 S. E. 558, 561, 61. L. R. A. 125, 99 Am. St. Rep. 870, the court said, Keith, P.: "It is true that it is not always necessary, in order to declare an act unconstitutional, to point out the precise provision which it violates, if it be repugnant to the spirit of the Constitution, or of the institutions which the Constitution creates."

To remove a man from office because of embezzlement, without giving him a day in court, runs counter to those fundamental instincts of fair dealing which lie at the base of all governments.

"In harmony with these principles it has been held that a statute providing for the removal of an officer chosen for a fixed term, which makes no provision for giving him notice or for allowing him to be heard in his defense, is contrary

to a constitutional provision that no person shall be deprived of life, liberty or property without due process of law." 22 R. C. L. 286.

Much has been said about the rights to office. It is not property in any narrow sense. If that were the touchstone this result might follow: The legislature, acting through the Governor or any other designated agent, might remove at pleasure any constitutional officer displeasing to it when the Constitution itself did not forbid. Should he protest, it might answer: "We have taken no property from you and you have no right to complain"—a proposition which answers itself.

In *Ekern* v. *McGovern,* 154 Wis. 157, 142 N. W. 595, 626, 46 L. R. A. (N. S.) 796, is this satisfactory statement as to the nature of an office: "So we may safely bring together the apparently conflicting ideas. An office, as a place, is not property. The right to hold an office and to take its emoluments until deprived thereof upon condition subsequent—due process of law—is property, in the broad sense which includes everything of every nature, tangible, intangible, corporeal, or incorporeal, valuable, pecuniarily or otherwise, to its possessor. In the sense incorporated into the fundamental guaranties, it is property." See also, *Foster* v. *Jones,* 79 Va. 642, 52 Am. Rep. 637; *Blair* v. *Marye,* 80 Va. 485.

Neither rights nor property can be confiscated by a legislative act without a judicial hearing after due notice. *Boggs* v. *Commonwealth,* 76 Va. 989, 999.

If constitutional warrant for section 366 rests anywhere, it rests in section 56 of the Constitution, which reads: "The manner of conducting and making returns of elections, of determining contested elections, and of filling vacancies in office, in cases not specially provided for by this Constitution, shall be prescribed by law, *and the General Assembly may declare the cases in which any office shall be deemed vacant where no provision is made for that purpose in this Constitution.*" (Italics supplied.)

Section 73 of the Constitution provides, in part, that the Governor, "during the recess of the General Assembly, shall have power to suspend from office for misbehavior, incapacity, neglect of official duty or acts performed without due authority of law, all executive officers at the seat of government except the Lieutenant-Governor, but in any case in which the power is so exercised the Governor shall report to the General Assembly, at the beginning of the next session thereof, the fact of such suspension and the cause therefor, whereupon the General Assembly shall determine whether such officer shall be restored or finally removed."

It seems plain that under section 73 of the Constitution the people in their sovereign capacity have withdrawn from the courts the power to pass upon the question of the correctness of the act of the Governor in suspending executive officers at the seat of government, and granted this power exclusively to the General Assembly. The Constitution, having vested the final determination of the question in the General Assembly, has ·excluded the power of the courts to pass upon the action of the Governor.

Section 366 of the Tax Code so clearly parallels the provisions of section 73 of the Constitution that it seems equally plain that the General Assembly has, by that section, undertaken to vest the Governor and the General Assembly, respectively, with powers corresponding to their respective powers under section 73 of the Constitution, and to exclude the judiciary from passing upon the existence of the cause for which the Governor has suspended an officer therein mentioned, and to reserve to itself the exclusive right to pass upon the question.

The grant of the power of removal under section 73 of the Constitution is not merely declaratory of a power existing in the General Assembly under the general grant of legislative power (sections 40 and 63, Const. Va.). It is an affirmative grant of a power which in the absence of such grant the legis-

lature did not have, certainly so far as constitutional officers are concerned.

As indicative of the meticulous care which the convention exercised in the protection of these elementary rights, we find in section 120 of the Constitution provision that even policemen cannot be removed from office by city executives except upon notice and an opportunity to be heard.

The only warrant for the removal of officers by the Governor, except that given in said section 73, must rest in section 56. Section 73 is perfectly clear upon its face, as is section 120. No one can read them without knowing exactly what the convention had in mind. At the most, section 56 carries with it this broad power only by attenuated construction. We believe that if the convention had intended to confer this radical power upon the executive, it would have done so in unambiguous terms, and it has not done so. The word "cases," as there used, means nothing more than circumstances or conditions. We have found no case holding that a provision that the legislature might provide the *cases* in which or the *causes* for which an officer might be removed, authorized the legislature to confer upon the Governor the power to exercise in connection with the suspension or removal of an officer powers essentially judicial.

Unless a Constitution provides otherwise, the right to notice is universally recognized when a question essentially judicial is involved. It is as old as the common law and is reaffirmed in Magna Charta, c. 29. In *Ramshay's Case,* 18 Q. B. 190, it is characterized as one of "the implied conditions prescribed by the principles of eternal justice." It is a part of the law of the land, or of due process of law. Va. Const., sections 8, 11; *Foster* v. *Kansas,* 112 U. S. 201, 5 S. Ct. 8, 97, 28 L. Ed. 629, 696; *Shurtleff* v. *United States,* 189 U. S. 311, 23 S. Ct. 535, 47 L. Ed. 828; 46 C. J. 989; 22 R. C. L. 574. These two last named authorities cite in support of their conclusions a cloud of cases. The reason for this rule, especially

when it involves the removal for cause of a constitutional officer, lies in the fact that the removal involves the exercise of a judicial function. This reason is sometimes stated and is. frequently assumed, but it is the underlying reason, for logically the Governor is not obliged to give anyone notice of any action of his done in executorial capacity.

In *Underwood* v. *McVeigh,* 23 Gratt. (64 Va.) 409, the court said: "The authorities on this point are overwhelming, and the decisions of all the tribunals of every country where an enlightened jurisprudence prevails are all one way. It lies at the very foundation of justice, that every person who is to be affected by an adjudication should have the opportunity of being heard in defense, both in repelling the allegations of fact, and upon the matter of law; and no sentence of any court is entitled to the least respect in any other court, or elsewhere, when it has been pronounced *ex parte* and without opportunity of defense."

Where the legislature is without power under the Constitution to suspend or remove an officer *except for cause,* then legal cause for suspension or removal must *exist in fact* before the officer may be suspended or removed. It is a *sine qua non* to the exercise of the power to remove. It is jurisdictional.

The ultimate determination of whether the requisite jurisdictional facts necessary to sustain the action of an officer exist is always essentially a judicial function. Therefore, in cases involving the suspension or removal of such constitutional officers, the ultimate determination of whether cause for suspension or removal in fact exists, is essentially a judicial function.

Every executive officer, before doing an executive act, must make an executive determination as to whether he has the power or jurisdiction to do the act. This is a necessary incident of his executive power and of his duty to obey the Constitution and the laws of the State in the exercise of powers and jurisdiction conferred upon him. An executive

officer may be authorized, or even required, to investigate and determine questions of fact in order to determine for himself whether the facts necessary to confer upon him jurisdiction to do a particular executive act exist; and may be authorized, upon such determination, to do such without first having procured a judicial determination·as to the existence of such jurisdictional facts. Neither of these things necessarily constitute his act the exercise of a judicial function, *provided* the ultimate determination of his power and jurisdiction in the particular case be left to the judiciary to be determined in a proper judicial proceeding thereafter to be had. But if expressly or by implication the ultimate and conclusive determination of the power or jurisdiction of the removing officer be committed to his judgment, then an essentially judicial function has been vested in him.

It is perfectly competent for the legislature to vest in the Governor power to suspend from office a delinquent officeholder—to suspend him for cause, but somewhere and at some time, before final judgment, it is imperatively necessary that he be given a day in court. The statute in judgment does not do this, but reserves to the legislature itself the power to pass upon this executive suspension. Whether or not Weston has embezzled funds belonging either to the State of Virginia or to Lee county is essentially a judicial question. This is the basis of his discharge and on it he is entitled to be heard, and to be heard by a court.

We think our conclusions find support in Virginia authorities, and we are satisfied that they are supported by sound principles of public policy.

Prof. John B. Minor, in his Institutes, Vol. 2, p. 33 (3d ed.), said: "Modes of Effecting the Removal from Office of One on the Grounds Above Named.—Resignation, expiration of term, and removal by competent authority, of course, terminate the office *proprio vigore;* but in the other cases of delinquency, the office is not determined, *ipso facto,* by the

concurrence of the cause. There must be a judgment of a motion, after a judicial ascertainment of the fact; which may be by indictment, or information, by writ of *quo warranto,* or by impeachment. (1 Tuck. Com. 11, B II; *Alexander's Case,* 1 Va. Cas. [3 Va.] 156; *Mann's Case,* 1 Va. Cas. [3 Va.] 308; *Wallace's Case,* 2 Va. Cas. [4 Va.] 130)."

In *Edmiston* v. *Campbell,* 1 Va. Cas. (3 Va.) 16, it appeared that Campbell, a justice of the peace, was removed by the Governor under an act of the legislature which gave him that authority. That act the legislature itself afterwards said was unconstitutional since it conferred upon the Governor judicial power. Campbell then resumed the duties of his office. His right to do so was questioned but was affirmed in that case. It is true that this decision might possibly have rested upon the repeal of the act under which Campbell was removed, but it is more than probable that the court agreed with the legislature as to the unconstitutionality of the first act. Had it been of any other opinion it doubtless would have said so.

In *Maddox* v. *Ewell,* 2 Va. Cas. (4 Va.) 59, the question arose as to whether an oath administered by one Alexander was of any effect, the contention being that Alexander had previously vacated his office because of some act of his which it is claimed had that effect. The court held that before Alexander could be disqualified those things relied upon to establish disqualification had to be "established by some proper judicial proceedings for that purpose instituted." If there was any room for doubt as to what was done in the *Campbell Case* there is none here.

In *Dew* v. *Judges of Sweet Spring District Court,* 3 Hen. & M. (13 Va.) 1, 3 Am. Dec. 639, it appears that the clerk of the district court, who had been duly appointed, took the oath of office but failed to give the required bond. He was removed and the legality of that act came under review. The court said: "Both the law and the Constitution require that

he should not be ousted of the office in which he had a freehold, but by due process of law."

Professor Minor's statement of the law was expressly approved in the *Bland and Giles County Judge Case,* 33 Gratt. (74 Va.) 443. In that case the fourth assignment of error dealt with the question of whether or not Easley had forfeited his office by becoming an attorney and practitioner at the bar of the court of which he was judge. It was said: "An office is terminated *proprio vigore* by resignation, expiration of term, and removal by competent authority. But in other cases the office is not determined *ipso facto* by the occurrence of the cause." Then in this opinion follows that statement of the law just quoted from Minor's Institutes. See also *Boggs* v. *Commonwealth, supra.*

It has been suggested that this court may, in this proceeding, hear and determine upon its merits the question whether cause in fact existed for the suspension of Weston. If the power to ultimately determine that question be an executive function, then all the cases to which we have been cited hold that a court may not inquire into this question further than to ascertain whether there was *any* evidence before the Governor tending to establish the existence of such cause. (The cases on this subject will be found collected and annotated in a note in 52 A. L. R., pp. 7-33.) Therefore, in no event could this court assume jurisdiction to hear and determine that question upon the merits, unless it be essentially a judicial question. But though the ultimate determination of the existence of cause is an essentially judicial question, the legislature has itself expressly assumed the exercise of this power and by necessary implication denied the exercise thereof to this court.

It has been suggested that any injustice done to Weston may be remedied by *quo warranto* proceedings. Should such be instituted, he would doubtless be told that he had been removed

under a valid statute which limited relief to legislative reinstatement, and that the courts could not help him.

In the case in judgment, Weston's term of office expires by limitation on the first day of January, 1932; so that he could not possibly be reinstated by the legislature unless called in special session, and there is, as we have seen, no way by which that body can be made to hear Weston or take any action at all.

The vice in the statute in judgment lies, not in the fact that the Governor was authorized to suspend this treasurer, but that final determination of the conclusiveness of this act and of the existence in fact of the alleged cause upon which it is based is a question essentially judicial, and has been taken from the courts.

It is true that this statue has been in existence in somewhat different form since 1887. Code, section 2791, now repealed. But it is likewise true that it has never heretofore been invoked, and it is also true that the legislature (Acts 1899-1900, p. 1241, c. 1140; Acts 1902-3-4, p. 553, c. 335, Code, section 2201, now repealed), possibly because it was uncertain as to the constitutionality of the act of 1887, provided that upon the report of an auditor showing delinquency, the court should suspend treasurers, clerks and other officers who fail to account for State funds. But these Code sections neither take from nor add to the statute in judgment, which must stand or fall upon its merits.

This constitutional officer has been removed by the Governor for cause and without notice. The statute relied upon makes this executive removal final unless the legislature sees fit to order his reinstatement. His right of appeal, such as it is, must be to the legislature, and by necessary implication he is denied an appeal to the courts. His guilt or innocence is a judicial question, and his right to have the courts pass upon it is, we think, clear.

For reasons stated, mandamus will not issue.

*Petition Refused.*

CAMPBELL, J., concurs in the opinion of HOLT, J.

EPES and HUDGINS, JJ., concurring in the conclusion that section 366 of the Tax Code is unconstitutional.

We concur in the conclusion reached in the opinion of Holt, J.; but we are of opinion that an office is not property and that neither the fourteenth amendment of the Constitution of the United States nor the corresponding provisions of the Constitution of Virginia (Const. section 11) have any application to this case.

In order that we may make our views clear, we state as briefly as is possible and without discussing the authorities, the reasons upon which we base our conclusion that section 366 of the Tax Code is unconstitutional.

We think section 366 of the Tax Code by necessary implication, if not by express provision, makes the General Assembly the sole judge of whether the cause for which the Governor has suspended an officer in fact exists, and excludes the courts from all jurisdiction to pass upon this question.

Where the Constitution provides for an office, prescribes the method of electing or appointing the officer, fixes his term of office, and makes no provision for his suspension or removal, except to provide that the General Assembly may declare the circumstances under or the causes for which he may be suspended or removed, the Constitution by an implication, which is as strong as an express prohibition, prohibits the suspension or removal of such officer *except for "cause,"* which cause must be a cause relating to and adversely "affecting the administration of the office and of a substantial nature directly affecting the rights and interests of the public."

Where the General Assembly is without power under the Constitution to suspend or remove an officer *except for cause,* or to authorize his suspension or removal *except for cause,* then legal cause for suspension or removal must *exist in fact* before the officer may be suspended or removed. The existence of cause is a *sine qua non* to the exercise of the power to suspend or remove, that is, it is jurisdictional.

The *ultimate* determination of the existence of a jurisdictional fact is always essentially and inherently a judicial function.

Therefore, in cases involving the suspension or removal of such constitutional officers, the ultimate determination of whether cause for suspension or removal in fact exists, is essentially and inherently a judicial function.

The power to make laws for future application relative to the suspension or removal of a public officer and to prescribe by whom and under what conditions he may be suspended or removed is essentially a legislative power.

But the power to execute and apply the law to specific cases and to adjudicate upon questions arising thereunder rests elsewhere, and cannot be exercised by the General Assembly unless the power to do so be expressly or by implication granted to it by the Constitution.

While the exercise of the power of suspension or removal may be primarily an executive function, it becomes an essentially judicial function, whenever by express provision of or implication from the Constitution or statute the exercise of the power is so conditioned that the person or body authorized to exercise the power is empowered in the exercise thereof to make a *final and conclusive* determination of a question which is essentially a judicial question, as is the ultimate determination of the existence of cause for the suspension or removal of a constitutional officer such as county treasurer.

Sections 5 and 39 of the Constitution of Virginia separate and distribute the powers of government; and section 39 pro-

vides that "Except as hereinafter provided, the legislative, executive and judicial departments shall be separate and distinct, so that neither exercise the powers properly belonging to either of the others, nor any person exercise the power of more than one of them at the same time."

By reason of the mandate and the prohibition contained in section 5 and section 39 of the Constitution, neither the Governor nor the General Assembly can exercise an essentially and inherently judicial function, unless expressly or impliedly authorized by the Constitution to do so.

Section 56 of the Constitution provides that the "General Assembly may declare the cases in which any office shall be deemed vacant where no provision is made for that purpose in this Constitution." It is contended that this language expressly empowers the General Assembly to exercise the power of suspension or removal of a county treasurer, even though the exercise of the power involve the ultimate determination of an essentially judicial question, or the exercise of an essentially judicial function; and that, therefore, section 366 of the Tax Code is not unconstitutional.

Section 56 of the Constitution, we think, is not susceptible of such construction. It does no more than reiterate the power of the General Assembly under its general grant of power (section 40 and section 63) to prescribe the circumstances under which an office shall be deemed to have become vacant, or the *"causes"* for which an officer may be removed.

It has been suggested that this court may, upon a petition for writ of mandamus, such as is here before the court, or upon a writ of *quo warranto,* hear and ultimately determine whether cause for which an officer has been suspended under section 366 of the Tax Code in fact exists; and that, therefore, this section is constitutional. This could not possibly be true unless the ultimate determination of this question be essentially a judicial function, for if it be not essentially a judicial function, but an executive function, or only a *quasi*

judicial function, this court may not assume to exercise it. So far as we have been able to find all cases which hold that the power ultimately to determine whether cause for suspension or removal by the Governor in fact existed is not essentially a judicial question, hold that the courts have no power to hear and determine whether cause for suspension or removal in fact exists, if there was *any* evidence before the Governor of the existence thereof. See the cases on this subject collected in a note in 52 A. L. R., p. 7-33.

The legislature in section 366 has undertaken to empower the Governor to suspend an officer, and to empower the legislature to perform to the exclusion of the courts the essentially judicial function of making the ultimate determination of whether cause for suspension or removal of a constitutional officer exists. For this reason section 366 is unconstitutional, and void. The power to suspend implies a suspension to some time, and the time specified for the suspension is until the legislature restore him to office. Section 366 so inseparably connects the power of the Governor to suspend with the exclusive power of the legislature ultimately to determine whether cause for suspension existed, that it is impossible to hold the power of the Governor to suspend constitutional and the power assumed by the legislature unconstitutional. The whole section must stand or fall together.

It is to be noted, however, that the General Assembly may restore the officer although cause for removal in fact exists, or may by mere non-action make his removal permanent though no cause in fact exists; and there is no provision for notice or a hearing, nor way by which the General Assembly may be required to take any action, while non-action is made a judgment of removal.

The power of the General Assembly to provide an effective and quick mode of accomplishing the suspension or removal of a defaulting officer does not stand or fall with the

constitutionality or unconstitutionality of section 366 of the Tax Code.

We entertain no doubt that the General Assembly may empower the Governor, when he has reason to believe that an officer has been guilty of misfeasance, malfeasance, or is incompetent, to institute an ouster proceeding under section 2705, Virginia Code 1919, in the courts for the amotion of the officer, and upon the institution of such proceeding to suspend the officer pending a judicial determination of the matter; or that the legislature may empower the Governor to remove an officer; when he has reason to believe that a cause for removal which has been provided by statute exists, *provided* the removed officer is afforded an opportunity to have a court of competent jurisdiction ultimately determine *de novo* whether such cause in fact exists. In both of these cases the Governor would be exercising an executive power. But section 366 of the Tax Code neither makes provision for nor, if constitutional, permits the accused officer or the public to have the question of the existence of the cause for which the Governor has suspended an officer ultimately determined by a court.

PRENTIS, C. J., dissenting.

For the reasons here stated, I dissent from the conclusion of the majority.

This is a petition for mandamus filed by Charles D. Fugate, averring that by authority of section 366 of the Tax Code of Virginia the Honorable John Garland Pollard, Governor of Virginia, issued an executive order whereby he suspended J. M. Weston, as treasurer of Lee county, Virginia, for causes stated in the order, hereinafter quoted; that the Governor had appointed and commissioned the petitioner as the successor of Weston for the time of suspension, with power to collect the taxes and public revenues of the county of Lee and the Com-

monwealth; that pursuant to that order and commission petitioner had qualified as treasurer of the county of Lee by executing his official bond and taking the oath of office, and that after such qualification, on December 4, 1930, he requested and demanded of Weston the delivery and surrender to him (Fugate) of the office and all the books, official records, papers, vouchers, funds and cash then in his hands and control and all the property, books and other insignia of the office; and that Weston refused to comply with his demand. Petitioner, therefore, invokes the original jurisdiction of this court and prays for a peremptory writ of mandamus to be issued against Weston, commanding him to comply with the demands stated. In Virginia, mandamus is an appropriate remedy. *Sinclair* v. *Young,* 100 Va. 284, 40 S. E. 907.

The order of the Governor recites that two certain audits of the accounts of J. M. Weston, treasurer of Lee county, had been furnished to him by the Auditor of Public Accounts, the first as of the 17th of May, 1930, and the second as of the 22nd of October, 1930, and that these audits show that J. M. Weston, as treasurer of Lee county, has failed and is failing to execute and perform the duties required of him under the laws of the Commonwealth with reference to the collection of the revenue, and that there was, in accordance with the audit of May 17, 1930, a deficiency in his accounts amounting to $95,594.18, and according to the audit of October 22, 1930, a deficiency amounting to $92,763.88. The order then recites that J. M. Weston had been afforded ample time in which to disprove the correctness of said audits and failed to do so; whereupon, the Governor, by authority of section 366 of the Tax Code of Virginia (Acts 1928, p. 35, c. 45), and because of the failure of Weston to execute and perform the duties required of him as treasurer of Lee county, under the laws of the Commonwealth with reference to the collection of the revenue, suspended Weston as treasurer of Lee county from collecting any of the State or local revenues thereafter, unless

the General Assembly, by joint resolution, should restore him to office. By the same order he appointed Charles D. Fugate to serve during the remainder of the present term of office of Weston, unless Weston should be sooner restored to office as provided by law. The order directed that copies thereof be forthwith transmitted to Weston, the suspended treasurer of Lee county, to Fugate, and to the judge of the Circuit Court of Lee county. Thereafter, December 4, 1930, Fugate executed the bond required by law before the Circuit Court of Lee county.

It is observed in passing that in the chapter of the Code regulating the procedure by mandamus, section 5837 provides that when the application is made to this court, "the case shall be heard and determined without a jury, and witnesses shall not be allowed to testify *viva voce* before the court, but their testimony, if desired, may be used in the form of depositions taken by either party on reasonable notice to the other, or his attorney, of the time and place of taking the same." So that the respondent, Weston, had here another opportunity to challenge and deny the condemning accusations upon which the action of the Governor was predicated. Instead of doing so, he filed a demurrer to the petition and entered into this stipulation as to the facts:

"For the purpose of this proceeding and only for that purpose, and in order that a more speedy determination of this mandamus proceeding may be had, it is stipulated by and between the parties hereto, acting through their counsel, that the following are to be considered the established facts:

"1. That on the 29th day of November, 1930, Honorable John Garland Pollard, Governor of Virginia, issued an executive order suspending J. M. Weston as treasurer of Lee county, and appointing Charles D. Fugate as his successor, and that Exhibit 'A' filed with the petition in this case is a true copy of the said executive order.

"2. That on December 4, 1930, the said Charles D. Fugate

executed his official bond and took the oath of office as appears from Exhibit 'B' filed with the petition.

"3. That the facts and matters stated in paragraph 3 of the petition are true.

"4. That the audit of the accounts of J. M. Weston as treasurer of Lee county, made by the Auditor of Public Accounts as of May 17, 1930, shows that on that date the said J. M. Weston was indebted to the county of Lee in the sum of $99,322.11; that on that date he was indebted to the State of Virginia in the sum of $4,399.09; and that on that date he had in cash or in cash items the sum of $8,127.02. A subsequent audit of the accounts of the said J. M. Weston, treasurer as aforesaid, as of October 22, 1930, made by the said Auditor of Public Accounts, shows that on that date the said J. M. Weston was indebted to the county of Lee in the sum of $99,463.49; that on that date he was indebted to the State of Virginia in the sum of $323.07; and that on that date he had in cash or in cash items the sum of $7,022.68.

"The sum of $323.07, shown to have been due to the State of Virginia by the said J. M. Weston as of October 22, 1930, was remitted by the said J. M. Weston to the Comptroller of the State of Virginia on November 13, 1930.

"The said J. M. Weston became treasurer of Lee county on January 1, 1924, and was re-elected in November, 1927, at the general election held on the 8th day of that month, for the term beginning January 1, 1928."

The grounds of demurrer are thus stated:

"The respondent, J. M. Weston, comes and says that the petition for a mandamus filed in this honorable court by the relator, Charles D. Fugate, is not good and sufficient in law, because:

"I. Relator has another adequate remedy.

"1. Code of Virginia, section 2705, provides a full, adequate and complete remedy.

"2. Code of Virginia, section 5841, provides as follows:

" 'A writ of *quo warranto* may be awarded and prosecuted in the name of the State of Virginia in the following cases: (4) against any person who shall intrude into or usurp any public office.'

"3. The relator has never had charge of the office of treasurer of Lee county, Virginia.

"4. Respondent was duly elected treasurer of Lee county at the general election held on November 8, 1927, for a period of four years, received the proper certificate of election, executed the required bond, took and subscribed the oath of office, entered upon the discharge of the duties of his office on January 1, 1928, and has held the office ever since.

"II. The attempted action of His Excellency, the Governor of Virginia, by an executive order to suspend or to remove respondent and to appoint relator treasurer of Lee county, Virginia, is void.

"III. Section 366 of the Tax Code of Virginia, under which it is alleged that His Excellency, the Governor of Virginia, acted, is unconstitutional.

"1. It is prohibited by section 11 of the Bill of Rights, and violates sections 1 and 17 of the same.

"2. It violates and contravenes section 39 of the Constitution of Virginia.

"3. It confers upon the Governor arbitrary and autocratic power which is contrary to and violative of the Virginia form and system of government.

"IV. The statute violates Magna Charta and the principles of the common law, as well as the fundamental principles of a representative government.

"1. It violates the fundamental principle that a person has a right to be heard before he is condemned.

"V. Sovereignty is in the people and they have never given their consent to the exercise of arbitrary, or autocratic, power by any one.

"VI. The statute is violative of and is prohibited by the

fourteenth amendment to the Constitution of the United States.

" '(1) No State shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States; (2) nor shall any State deprive any person of life, liberty or property without due process of law; (3) nor deny to any person within its jurisdiction the equal protection of its laws.'

"And of these the respondent prays the judgment of the honorable court."

Constitution, section 1, Bill of Rights, refers to the natural equality of men and the inherent rights of life, liberty, private property and the pursuit of happiness and safety. Section 17 refers to the construction of the Bill of Rights—that is, that it shall not be construed to limit other rights not therein expressed. So that we need say no more about the grounds of demurrer based on those sections.

Section 366 of the Tax Code of Virginia (Acts 1928, p. 207, c. 45), reads: "The Governor shall have power to suspend the treasurer of any county or city of this Commonwealth or other officer charged with the collection of the public revenues, from collecting the revenues of the State or of such county or city, for failure to execute and perform the duties required of such officer under the laws of the Commonwealth with reference to the collection of the revenue; and said officer shall not collect any further the revenues unless the General Assembly by joint resolution restore him to office. The collection of the revenues in such city or county shall then be made by the person appointed by the Governor for that purpose, and such appointee, after having qualified and given bond according to law, shall discharge all the duties of the office to which he is appointed during the time of the suspension of his predecessor, and shall be amenable to all the rules, regulations, requirements and responsibilities declared by the

laws of this State pertaining to the collection of the public revenues."

For the purposes of this case, this statute needs no interpretation. Its provisions are clear and have been followed.

As early as 1887 (Acts 1887, p. 427), the Governor was invested with power to suspend a treasurer from any further collection of the revenues of the State, in the event of his failure to perform the duties required of him with reference thereto. Section 366, just above quoted, so amended and re-enacted the former act as to provide for the summary suspension of unfaithful treasurers who failed to account for either State or local funds.

Some emphasis is laid in the argument upon the fact shown by the stipulation that the treasurer is not now in arrears as to State funds, as though the funds of the county of Lee were the funds of some foreign jurisdiction with which the Governor and General Assembly had no concern. This is an erroneous view, for it is as clearly the obligatory duty of the General Assembly to conserve and protect the funds contributed by the taxpayers of Lee county for their local government as it is their obligation to protect the funds contributed specifically for the support of the State government. That such protection of all the revenues was sorely needed is shown by the facts of this case, conceded by the demurrer.

At the time of the adoption of Tax Code, section 366, the whole of Code 1919, section 2201, was repealed. That section undertook to empower the judge of each city and circuit court of record to suspend a local treasurer who had failed to account for any public funds due by him. Section 366 of the Tax Code undertook to vest this power of suspension of officers charged with the collection of public funds who proved unfaithful in their public trust in the Governor alone.

The fundamental question raised here is whether the General Assembly has exceeded its powers by the enactment of section 366.

In the case of *Whitlock* v. *Hawkins,* 105 Va. 248, 53 S. E. 401, it is said that there is no stronger presumption known to the law than that which is made by the courts with respect to the constitutionality of an act of legislation. The infraction must be clear and palpable, and seldom if ever should a statute be held void as repugnant to the Constitution if the question be doubtful. *Danville* v. *Pace,* 25 Gratt. (66 Va.) 9, 18 Am. Rep. 663; *Fletcher* v. *Peck,* 6 Cranch 128, 3 L. Ed. 162.

The act authorizing circuit courts to extend the corporate limits of cities and towns was vigorously attacked in the case of *Henrico County* v. *City of Richmond and Others,* 106 Va. 282, 55 S. E. 683, 117 Am. St. Rep. 1001, because it certainly conferred legislative power on courts. The act was, however, upheld, and in the course of the opinion (p. 292 of 106 Va., 55 S. E. 683, 686), this is said: "It is not to be denied that this court may declare an act of the General Assembly unconstitutional. It is, however, a delicate matter to hold that the legislative department of the government has transcended its powers, and it will not be done except in a case where there is a clear violation of some explicit provision of the Constitution or Bill of Rights. To doubt must be to affirm." At p. 295 of 106 Va., 55 S. E. 683, 688, it is said: "This legislative construction of the Constitution is entitled to no inconsiderable weight, and cannot be lightly set aside."

This presumption has been many times expressed and emphasized by the courts, and in no jurisdiction, we believe, more emphatically than in Virginia.

Judge Burks, the younger, in *City of Roanoke* v. *Elliott,* 123 Va. 406, 96 S. E. 819, 824, thus emphasized it: "Every presumption, therefore, is to be made in favor of the constitutionality of a statute, and it will never be declared to be unconstitutional unless it is plainly and clearly so. If any reasonable doubt exists as to its constitutionality, the act will be upheld. To doubt is to affirm. The mere passage of a statute is an affirmance by the General Assembly of its con-

stitutional power to adopt it, and the case must be plain indeed before a court will declare a statute null and void. These principles have been repeatedly announced by this court from a very early date."

While the writer has never given assent to the proposition that merely "to doubt is to affirm," there can be no question whatever about the proposition that one who alleges the unconstitutionality of an act must bear the burden of showing its unconstitutionality with a cogency which cannot be fairly answered, and that to raise a doubt is insufficient.

Of course, along with this rule, we must remember the fundamental purpose of a State Constitution, as expressed in *Strawberry Hill, &c.* v. *Starbuck,* 124 Va. 77, 97 S. E. 362, 364, where this is said: "In determining the constitutionality of a statute, we must of course always bear in mind that the State Constitution is not a grant of power, but only the restriction of powers otherwise practically unlimited; that except so far as restrained by the Constitution, the legislature has plenary power; and that every fair doubt must be resolved in favor of the constitutionality of an act of the General Assembly. *Ex parte Settle,* 114 Va. 715, 77 S. E. 496; *Pine and Scott* v. *Commonwealth,* 121 Va. 822, 93 S. E. 652."

This principle must have been in mind when, in Constitution, section 63, out of abundant caution, legislative power not limited is expressly reserved to the General Assembly: "The authority of the General Assembly shall extend to all subjects of legislation, not herein forbidden or restricted; and a specific grant of authority in this Constitution upon a subject shall not work a restriction of its authority upon the same or any other subject."

The emphasis of the arguments here against this statute (held by the majority to be sound) is based upon section 5 of the Bill of Rights, providing that the legislative, executive and judicial departments shall be separate and distinct; and section 39, reading: "Except as hereinafter provided, the legis-

lative, executive and judicial departments shall be separate and distinct, so that neither exercise the powers properly belonging to either of the others, nor any person exercise the power of more than one of them at the same time."

Constitution, sections 110 and 112, provide for the election of county treasurers in each county by the qualified voters, and that they shall hold their office for the term of four years, their duties and compensation to be prescribed by general law.

The majority hold that because the office is created by the Constitution for a fixed term, the General Assembly is prohibited from providing for the summary suspension of the incumbent, even though he fails to account for the public funds as required by law. Upon the face of it, such a contention shocks the impartial mind. That because the term is fixed, the people of the State have intended thereby to create a class of public servants who are above the law seems to me incredible had the statute merely depended upon the power of the people always by implication reserved. Obviously, this reservation includes the power to provide for orderly government, taxation, the collection and preservation of the revenues and the enforcement of the laws.

It is not necessary, however, in this case, to sustain the validity of this statute, as authorized solely by this reserved power—this because Constitution, section 56, provides: "The manner * * * of filling vacancies in office, in cases not specially provided for by this Constitution, shall be prescribed by law, and the General Assembly may declare the cases in which any office shall be deemed vacant where no provision is made for that purpose in this Constitution."

It is conceded by respondent that this section was intended to authorize enactment of statutes which provide that an office shall become vacant when the officer is adjudged insane, or where a State or local officer accepts a United States office, or by the acceptance of one or more other specified offices;

but he contends that it cannot be construed to authorize suspension for gross dereliction pursuant to the statute, section 366. Constitution, section 56, however, refers to any office, and it seems to me that it is impossible to conceive of any better reason for declaring this office vacant than that the incumbent has collected public revenues and failed to preserve them, in violation of mandatory statutes. Unless, in the construction of this section (Const., section 56), we are to "stick in the bark," we should apply the rule that the greater power includes the less, and it being clear that the General Assembly (they being the initial judges of the reasons therefor) may declare the conditions under which such an office shall become vacant, this obviously includes the power to provide for the suspension of an officer for failure to discharge the specific duties imposed upon him by law.

In the voluminous discussion, some vital considerations seem to have been overlooked. This suspension was neither made without notice, nor without cause; and this is a sufficient answer to the argument based upon some precedents where officials have been removed summarily and without sufficient cause.

That it is the duty of the court to enforce the legislative power, as expressed by statute, so far as is possible within the constitutional limitations, of course, is not denied. To the legalistic mind, overmuch confused rather than convinced by the multitude of precedents, the case presents difficulties only because of impossibility of reconciling conflicts of judicial expressions, sometimes mistaken for judicial decisions. If these confusions are disregarded, as irreconcilable, and we discard the illogical and discover the true, these difficulties disappear.

It seems to be contended that constitutional officers are in a sense sacro-sanct and above all legislative control which results in requiring them to surrender their positions before the end of the term fixed by the Constitution. To this I cannot

assent. Constitutional officers are subject to suspension for misfeasance and to regulation by law to the same extent as officers not named in the Constitution, except, and only except, when and as such immunity is clearly found in the Constitution itself.

It is, however, held by the majority that the act confers judicial powers upon the Governor, and hence violates the sections providing for the separation of the executive from the judicial power.

Mr. Madison's idea of this provision is thus expressed: "From these facts, by which Montesquieu was guided, it may clearly be inferred, that in saying 'there can be no liberty, where the legislative and executive powers are united in the same person, or body of magistrates;' or, 'if the power of judging be not separated from the legislative and executive powers,' he did not mean that these departments ought to have no partial agency in, or no control over the acts of each other. His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free Constitution are subverted. This would have been the case in the Constitution examined by him, if the king, who is the sole executive magistrate, had possessed also the complete legislative power, or the supreme administration of justice; or if the entire legislative body had possessed the supreme judiciary, or the supreme executive authority."

Story's Constitutions, p. 395, repeats that we are to understand this maxim in the limited sense expressed by Mr. Madison; and this court, in *Winchester & Strasburg R. Co.* v. *Commonwealth,* 106 Va. 264, 55 S. E. 692, in upholding the legislative, executive and judicial powers of the State Corporation Commission, conferred by the Constitution, said substantially the same thing.

That there are other well-defined limitations upon the legislative power must be conceded. *Farmer* v. *Christian,* 154 Va. 48, 152 S. E. 382.

The cases and the statutes abound with instances in which judicial officers have been charged with the performance of duties clearly executive or ministerial, and ministerial officers charged with duties which require investigation of facts comparable with judicial investigations.

*Lewis* v. *Christian,* 101 Va. 135, 43 S. E. 331, is an instance. There an oyster inspector was required by statute to determine whether oyster rock was natural oyster rock, according to survey and report. If so, and stakes and oysters had been placed upon that oyster rock or bed by the planter, the duty was imposed upon the inspector to have them removed. The court held that notwithstanding his duty to determine and ascertain the existence of the necessary facts, it was none the less ministerial because he had to determine whether or not the facts existed which made it his duty to act. This court, referring to that case, said this, in *City of Roanoke* v. *Elliott,* 123 Va. 410, 96 S. E. 819, 825: "In other words, the duty to ascertain a fact from evidence does not *per se* render the duty judicial. It is not easy to lay down a general rule by which it may always be determined what acts are judicial and what are ministerial, and we shall not attempt it. But it is safe to say that whether a duty imposed is judicial or ministerial is to be determined by the nature of that duty, and not by the tribunal or person that is to discharge it. That judicial tribunals are often charged with the performance of purely ministerial functions is well illustrated by the cases hereinbefore cited, and it is equally true that executive or ministerial officers are also sometimes charged with judicial or *quasi* judicial functions. See. *Thurston* v. *Hudgins,* 93 Va. 780, 20 S. E. 966, and *Rowe* v. *Drisgell,* 100 Va. 137, 40 S. E. 609; note in 44 Am. St. Rep. at p. 46, and cases cited."

This must have been the idea of the New York court, *In re Guden,* 171 N. Y. 531, 64 N. E. 451, 452, where this is said: "In this country the power of removal is an executive power, and in this State it has been vested in the Governor by the people. (Constitution, art. IV, sec. 1.) The Constitution further specifically provides—and has since 1821 in effect, and since 1846 in precisely the same words—that 'the Governor may remove any officer, in this section mentioned (sheriffs, clerks of counties, district attorneys and registers in counties having registers), within the term for which he shall have been elected; giving to such officer a copy of the charges against him, and an opportunity of being heard in his defense.' (Art. X, sec. 1.) It does not require argument to persuade the mind that the power thus conferred is executive, not judicial, and that it was intended to be vested exclusively in the Governor."

This to me seems certainly true as to those other sections of the Virginia Constitution which authorize the Governor to suspend certain State officers. I am aware that many courts have called such a power a judicial power, but I agree with the New York court. As the power to appoint is executive, it follows that the power to remove is also executive, and the mere fact that the Governor must determine certain facts before he exercises his power does not change the essential nature of the power.

The case of *Conklin* v. *Cunningham,* 7 N. M. 460, 38 Pac. 170, 174, supports the same view. There a collector was removed under a statute for failure to pay over school moneys previously collected by him within thirty days after the 10th day of the month. What is said on this branch of the case is worthy of repetition: "In the exercise of the powers confided to his discretion and in the performance of the duties imposed upon him, the executive is independent of the judiciary; and presumptively his acts are within the limitations of his authority, and must be recognized by the judicial tri-

bunals. *Prima facie,* the order of removal in this case was a
legal exercise of executive authority; and the appointment of
Cunningham constituted a commission that was evidence,
*prima facie,* that he was lawfully entitled to the sheriffalty,
and imposed upon the contestant the burden of showing a bet-
ter title by an action in the nature of *quo warranto. People* v.
*Head,* 25 Ill. 325; *State* v. *County Court of Howard County,*
41 Mo. 247; *Wenner* v. *Smith,* 4 Utah 238, 9 Pac. 297;
*Plowman* v. *Thornton,* 52 Ala. 559; 14 Am. and Eng. Encyclo-
pedia of Law, cl. 3, p. 143, and citations there made.

"An appointment to office by the executive is complete upon
the delivery of the commission. *Marbury* v. *Madison,* 1
Cranch [U. S.] 137 [2 L. Ed. 60]; *Wetherbee* v. *Cazneau,* 20
Cal. 503. We think that when the Governor appointed and
commissioned the plaintiff, he gave him *prima facie* title to
the office. *People* v. *Head,* 25 Ill. 325. The commission of
the Governor, when issued, must be taken at least as *prima
facie* evidence that the person holding it is lawfully entitled
to the office. *State* v. *County Court of Howard County,* 41
Mo. 247. The powers of a Governor are executive, not
judicial, and they must be exercised promptly, to be effective.
Notice to a defaulter is invitation to repair deficiency with
a view to retention of office. To afford opportunity to make
good delinquency is to protect the violator of a trust, and to
supplant summary action by judicial investigation. The im-
pending penalty of removal is to deter breach in office, and
to encourage fidelity and promptness in the discharge of its
duties. Trial is not an executive function, and its assumption
would be the emasculation of executive efficiency. The section
under which the Governor proceeded is mandatory, and directs
summary action, quick execution, and that it is impracticable
to attain such a result by the dilatory process of charges and
defenses is manifest. A summary end by prolix means is an
impossible achievement. So inconceivable is the rapidity in the
redress of wrongs by tedious and vexatious remedies, that it

is not legitimate to impute such contradiction to the legislature, unless it shall appear in express terms, and the omission of any requirement of notice from the provisions of section 27 must be regarded as the expression of an intention that notice should not be an essential to its enforcement. The examination of the accounts of the sheriff, and the finding that he has not accounted for moneys of the county as required by law, and that he was in arrears with the county, and removing him from office, is not judicial action, and does not require due process of law. But whether notice to the respondent was a legal requirement is essentially an issue for judicial inquiry and determination. *Donahue* v. *County of Will, et al.,* 100 Ill. 94."

In the case there cited, *Donahue* v. *County of Will,* the facts were strikingly like this case. A statute authorized the county courts to remove county treasurers from office for neglect or refusal to render an account, or to make settlement, as required by law, or when he was a defaulter, or when he was in arrears. There county treasurers were created by the Constitution, as here, and given a term of two years. The county court removed Donahue under authority of the statute. Most, if not all, of the questions raised here were raised there, but the action of the court was upheld. This is said as to one phase of the case (p. 103 of 100 Ill.) : "It is impossible to conceive how under our form of government a person can own or have a title to a governmental office. Offices are created for the administration of public affairs. When a person is inducted into an office, he thereby becomes empowered to exercise its powers and perform its duties, not for his, but for the public benefit. It would be a misnomer and a perversion of terms to say that an incumbent owned an office, or had any title to it."

This from *Conner* v. *Mayor of New York,* 1 Seld. (5 N. Y.) 295, is quoted: "Public offices in this State are not incorporeal hereditaments, nor have they the character or quality

of grants. They are agencies. With few exceptions, they are voluntarily taken and may at any time be resigned. They are created for the benefit of the public, and not granted for the benefit of the incumbent. Their terms are fixed with a view to utility and convenience, and not for the purpose of granting the emoluments during that period to the officeholder. * * *

"The prospective salary or other emoluments of a public office are not the property of the officer, nor the property of the State. They are not property at all. They are like daily wages unearned, and which may never be earned. The incumbent may die or resign, and his place be filled, and the wages be earned by another. The right to the compensation grows out of the rendition of services, and not out of any contract between the government and the officer that the services shall be rendered by him."

It may be added that a fundamental difference between an office and property is that an office cannot be transferred by the incumbent. It is neither transmissible nor inheritable. Upon his induction into office, he acquires the legal right to exercise its functions and to receive the salary which he earns, either to the end of his term or until his resignation or the lawful determination of his right thereto.

That case is well reasoned, and while there are some cases with which it cannot be reconciled, it is fully supported by other cases and by sound logic.

Many of the cases involving the right to office have been the result of bitter political antagonism—notably the case of *Taylor* v. *Beckham*, 178 U. S. 548, 20 S. Ct. 890, 900, 44 L. Ed. 1187. This case involved the contest over the office of Governor of Kentucky, Goebel, the Democratic candidate, having been killed just before he expected to be inaugurated. The case was carefully considered by the Supreme Court of the United States, and since then the question as to whether offices are property should be regarded as finally settled. The court stated: "The decisions are numerous to the effect that

public offices are mere agencies or trusts, and not property as such. Nor are the salary and emoluments property, secured by contract, but compensation for services actually rendered." The court held that one deprived of an office could not invoke the fourteenth amendment of the Federal Constitution, providing that no person shall be deprived of life, liberty or property without due process of law. *Wilson* v. *North Carolina,* 169 U. S. 586, 18 S. Ct. 435, 42 L. Ed. 866; *Butler* v. *Pennsylvania,* 10 Howard (U. S.) 402, 13 L. Ed. 472.

The case of *Ekern* v. *McGovern,* 154 Wis. 157, 142 N. W. 595, 633, 46 L. R. A. (N. S.) 796, is another such case. There McGovern, the Governor, undertook to remove Ekern, the commissioner of insurance, a statutory officer, three years before the expiration of his term. His authority therefor was a statute giving him authority to remove "for official misconduct, habitual or wilful neglect of duty," at any time during the recess of the legislature. The Governor and the insurance commissioner differed in a hot political contest as to who should be elected speaker of the house, and the commissioner was removed on an hour's notice, without any opportunity being given to defend himself, upon a charge that he served "as and under the political committee and as manager of the political campaign for one L. L. Johnson, who was then and there a candidate for the office of Speaker of the Assembly of the State of Wisconsin, contrary to the provisions of section 1966y of the Statutes." At this hasty hearing the first objection to the proceeding was that the statute conferred authority upon the Governor only when the legislature was not in session, and that as the Assembly was to convene at twelve o'clock, noon, on that day, the Governor was without authority to exercise the power at any time on that day. The court decided against the Governor for many reasons elaborately expressed (the entire case covering 171 pages of the official report), the most obvious being the arbitrary exercise of a doubtful power (the legislature being about to convene) and

of insufficient notice. There were two dissenting opinions, in which it is stated that the majority of the court repudiated two well-considered precedents in Wisconsin. The result of the case indicates then that the courts will disregard some precedents rather than sanction the abuse of executive power under such statutes.

Chief Justice Winslow, in his dissenting opinion, avowed himself to be no worshiper of precedents, and that he had joined in the slaughter of precedents on numerous occasions, and felt that he was rendering good service to the Commonwealth because he thought they were wrong in principle or to have outgrown their usefulness owing to changed conditions and increasing knowledge. He indicated some of his grounds of dissent in this language, which expresses, I think, great wisdom: "The most serious infirmity in the decision in this case, as I regard it, is, not that it refuses to follow precedent, but that it is really a step backward—a signal to retreat rather than to advance. The present case is a case where a very important State office is at stake, but the principles decided apply as well to every ministerial officer, however, insignificant, whose removal is provided for by a statute similar to section 970, and there are many of them. Every such officer is by this decision fortified and entrenched in his office. Proceedings to remove him on the part of his superior will be of little avail so far as immediate results are concerned. If he can persuade a court that he is acting in good faith, he can practically deny the power of his superior to remove him and remain in his office for months while the necessary slow processes of the law in circuit and supreme court are reaching a result. The arm of the superior officer will be rendered nerveless, and the man who is charged with responsibility for results will have practically no certain means of achieving results because unable to command efficient service from his subordinates. Such is not the genius of the democracy of today, much less of the democracy of the future. That

democracy will unquestionably elect a few men as the heads of its various departments, and demand of them results. * * *

"And so I say that this decision is a step backward; it tends to hamper the responsible heads of departments of the government; it seeks to return to the exploded idea that there is some private property right in an office, whereas the true idea is that it is simply an opportunity to serve the State.

"The idea that some designing man will build up a despotism on the ruins of our liberties, if he be given the right of removal from office without notice or hearing, cannot be seriously entertained. There is no such danger in these days. It is the merest myth. The danger is rather that the responsible head of a governmental department will not have authority enough over his working force to perform the duties which the people have placed upon him and for the performance of which he is directly responsible. For this reason I regard the present decision as an unfortunate step in the wrong direction."

To fail to study and respect applicable precedents would be to disregard the wisdom of experience, and result in confusion and uncertainty; to follow precedents without subjecting them to the test of reason would be to deal with the law as though it were so lifeless as to make its improvement impossible. Because our law should improve by growth in order to meet the changing needs of a progressive people, those precedents which under closer study, wider experience and new conditions fail to meet the test of reason should be disregarded or distinguished. Only thus can the courts meet their responsibilities and prove their claim to be the best instrumentality yet devised for the promotion of that perfect justice among men, which we seek after, if haply we may find it.

It is so well settled in this country that an office is not property that it seems unnecessary to multiply citations of cases so holding. The only State in which the contrary was ever held was North Carolina, and in the later case of *Mial* v.

*Ellington,* 134 N. C. 131, 46 S. E. 961, 65 L. R. A. 697, the view previously expressed was positively repudiated. Note, 4 A. L. R. 205; *Luckett* v. *Madison County,* 137 Miss. 1, 101 So. 851, 37 A. L. R. 814.

It should also be regarded as finally settled by the overwhelming weight of authority that the fourteenth amendment of the United States Constitution and similar provisions in State Constitutions cannot be invoked by one who is removed from office. That clause guarantees due process of law and equal protection of the laws as to personal and property rights, but cannot be properly invoked in cases of removal from office, because offices are not property.

The avowed basis of the majority opinion is that the power of removal is so essentially a judicial power that it cannot be conferred upon the Governor without violating the constitutional provisions relating to the separation of the executive, legislative and judicial powers. The same question is raised in almost every such case, and it has been frequently considered by the courts.

Almost every court which has held that it is so essentially a judicial power that it can only be exercised in a judicial proceeding has based that conclusion upon the unsound theory that an officeholder has a property right, or, as sometimes expressed, a "vested interest." There is abundant authority repudiating this idea. Throop on Public Offices, sec. 345.

In *Territory* v. *Cox,* 6 Dak. 510, this is said: "The authorities holding that removal from office is a judicial power and can be exercised only by the courts are based upon the theory that an office is in the nature of a property right, and that the citizen can be deprived of it only by 'due process of law,' while the other line of decisions holds that under our form of government there is no property in an office, that offices and officers are for the benefit of the people, and not for the benefit of the officers, and that whenever the officer fails to perform the duties of the office, the office becomes

forfeited, and that the only object of the examination neces-
sary to determine such forfeiture is such as will establish the
fact, not to the satisfaction of, or for the benefit of, the incum-
bent, but to the satisfaction of the executive department which
is charged with the execution of the laws, and that hence the
removal may be summary, or upon such investigation as may
be prescribed by the legislative department."

So also in the much cited case of *State* v. *Hawkins*, 44
Ohio St. 98, 5 N. E. 228, 234, this is said: "But these decisions
have, as a rule, proceeded upon the ground that an incumbent
has a property in his office, and that he cannot be deprived of
his right without the judgment of a court. This view finds
support in the doctrines of the common law, which regarded
an office as a hereditament, but has no foundation whatever in
a representative government like our own."

The courts have exclusive power to hear and determine
those matters which affect the life, liberty or property of the
citizen, because no person can be deprived of life, liberty or
property without due process of law; but all other rights,
although they may necessitate an inquiry in some sense
judicial, should not be held to be within the jurisdiction of the
court to the extent that their exercise by another department,
duly authorized, would be void.

This statement of the generally accepted doctrine from
12 C. J. 399, is well supported by the weight of authority:
"Although a statute authorizing a removal by the Governor
or other executive officer for cause contemplates an investiga-
tion by such officer of the grounds of complaint, and the
formation of a judgment by him, it does not constitute an
encroachment on the judiciary, since the judgment and dis-
cretion to be exercised is of an executive and not of a judicial
nature."

The case of *Donahue* v. *County of Will, supra,* approves
this view, saying this: "It may, in many cases, be a matter of
difficulty to determine the precise line which divides the exec-

utive and judicial functions. It has been said that where the functionary hears, considers and determines, then he performs judicial acts. This definition is not strictly accurate. * * * There is in every ministerial or executive act a necessity for the hearing of evidence, a consideration of the evidence, and a determination based on it. * * * So it is seen the definition is by no means accurate. It embraces cases that are not judicial, and hence is too comprehensive. From the cases we have referred to, it will be seen that such a removal as this was not regarded as judicial in its nature, and such acts were held valid notwithstanding they were performed by a single executive officer, or by an executive body."

In *State* v. *Hawkins*, 44 Ohio St. 98, 5 N. E. 228, 232, the Governor, by statute, had been given power to remove police commissioners of cities for cause, and in referring to this phase of the case it was said: "In answer to the information, it is claimed by the respondents, that the Governor had no power to remove them; and, again, that if he had, it was not properly exercised.

"The first claim is upon the assumed ground, that the power conferred on the Governor by the statute to remove any of them for official misconduct is judicial in its nature, and, though conferred by the act, cannot be exercised, as the judicial power of the State is, by section 1, article 4, of the Constitution, conferred upon the courts of the State only.

"This is not to be regarded as an entirely new question. It has been much discussed by courts and writers, without being able to formulate any general rule upon the subject. What is judicial power cannot be brought within the ring-fence of a definition. It is undoubtedly power to hear and determine; but this is not peculiar to the judicial office. Many of the acts of administrative and executive officers involve the exercise of the same power. Boards for the equalization of taxes, of public works, of county commissioners, township trustees, judges of election, viewers of roads, all, in one form or an-

other, hear and determine questions in the exercise of their functions, more or less directly affecting private, as well as public rights. It may be safely conceded, that power to hear and determine rights of property and of person between private parties, is judicial, and can only be conferred on the courts. (*Merrill* v. *Sherburne,* 1 N. H. 199 [8 Am. Dec. 52].) But such a definition, does not necessarily include this case. The incumbent of an office has not, under our system of government, any property in it. His right to exercise it is not based upon any contract or grant. It is conferred on him as a public trust to be exercised for the benefit of the public."

The Kansas court took the same view in *McMaster* v. *Herald,* 56 Kan. 231, 42 Pac. 697, 698, for it said: "The defendant challenges the right of the Governor to investigate any charge of official misconduct with a view to removal from office. He contends that such a power cannot be conferred upon the Governor, nor, indeed, upon any other person, officer or tribunal but the courts. This would be an interesting question, if new, but it is not new. It received very full examination and consideration in the case of *Lynch* v. *Chase,* 55 Kan. 367, 40 Pac. 666. It was there held (Justice Johnston delivering the opinion of the court) that it is within the power of the legislature to provide a summary method of removing incompetent and unfaithful officers, and to that end it may confer authority upon executive officers; and that while the proceeding to remove from office for cause involves the examination of facts, and the exercise of judgment and discretion, by the executive officer, his action is not judicial, in the sense that it belongs exclusively to the courts."

So, too, in the case of *State* v. *Frazier,* 39 N. D. 430, 167 N. W. 510, 513: "It is generally held that the power of removal from office is not a judicial, but an administrative, power, though it should be exercised in a judicial manner. The exigencies of the government often require the prompt

removal of corrupt or unfaithful officers, and, such being the case, the legislature has the power to provide for removal."

*State* v. *Ross,* 31 Wyo. 500, 228 Pac. 636, 641, thus answers the objection: "*Quasi* judicial power has been defined as the power to perform acts administrative in character, but requiring incidentally the trial and determination of questions of law and fact. 36 Harvard L. Rev., p. 420. This is the character of the power of the board of control as considered in *Farm Investment Co.* v. *Carpenter* [9 Wyo. 110, 61 Pac. 258, 50 L. R. A. 747, 87 Am. St. Rep. 918], *supra,* and of the Governor as conferred upon him by the challenged statute. Such a power is not one properly belonging to the judiciary, within the meaning of section 1 of article 2 of the Constitution. This view finds support in a great number of authorities, of which we cite only a few."

Acting under a statute substantially similar to the Virginia statute under review, the Governor of North Carolina suspended the railroad commissioner of that State, for causes authorized by the statute. The action of the Governor was upheld in *State ex rel. Caldwell* v. *Wilson,* 121 N. C. 425, 28 S. E. 554. A writ of error in the case was dismissed by the Supreme Court of the United States, *Wilson* v. *North Carolina,* No. 559. 169 U. S. 600, 18 S. Ct. 435, 42 L. Ed. 865, referred to the same controversy, confirming that result.

Other cases to the same effect are, *State* v. *Oleson,* 15 Neb. 247, 18 N. W. 45; *State* v. *Doherty,* 25 La. Ann. 119, 13 Am. Rep. 131; *Gray* v. *McLendon,* 134 Ga. 224, 67 S. E. 859; *State* v. *Dahl,* 140 Wis. 301, 122 N. W. 748; *State* v. *Wells,* 210 Mo. 601, 109 S. W. 758; *State ex rel. Rawlinson* v. *Ansel,* 76 S. C. 395, 57 S. E. 185, 11 Ann. Cas. 613; *Gibbs* v. *Board of Aldermen,* 99 Ky. 490, 36 S. W. 524; *Cameron* v. *Parker,* 2 Okla. 277, 38 Pac. 14; *Churchill* v. *Hay,* 45 Neb. 321, 63 N. W. 821; *State ex rel. Vogt* v. *Donahey,* 108 Ohio St. 440, 140 N. E. 609.

Among the cases cited and relied upon for respondent is *Board of Police Commissioners of Jersey City* v. *Pritchard,*

36 N. J. L. 101. That case, while containing many sound expressions, is of little value in determining the question presented here, because there the Governor undertook to exercise the power to remove an officer without having any legislative authority whatever for his action. In the later case of *Mc-Cran* v. *Gaul,* 95 N. J. L. 393, 112 Atl. 341; *Id.,* 96 N. J. L. 165, 112 Atl. 603, the New Jersey court held that the power to remove an officer may be conferred upon the Governor by law, and referred to the fact that Chief Justice Beasley, in the *Prichard Case,* was careful to point out that no power of removal had then been conferred upon the Governor.

Another case relied upon for respondent is *Page* v. *Hardin,* 8 B. Mon. 648. This case was decided in 1848, and cannot, as to this point, be reconciled with the later Kentucky case of *Holliday* v. *Fields* (1925), 207 Ky. 463, 269 S. W. 539, 540. The opinion did not refer to the earlier Kentucky case (possibly because it recalled a painful political controversy in which the actors were all dead), but cites many later cases, and in this language holds that the power to remove an officer is an administrative power: "On principle and on authority, we are clearly of the opinion that the power of removal from office of peace officers here in question is an administrative or executive function and not a judicial one, and the authority vested in the Governor to hear and determine the facts on which he is to base the exercise of his judgment and discretion is not judicial in the sense that it belongs exclusively to the courts."

The much cited case of *Dullam* v. *Wilson,* 53 Mich. 392, 19 N. W. 112, 51 Am. Rep. 128, is also relied upon by the respondent. It holds that the removal of an officer is the exercise of a judicial power. That opinion from an able court has done and continues to do much evil. It seems to be based upon the idea that an office is property. The fundamental support for that view has been distinctly repudiated in a later case by the Michigan court, for in *Attorney-General* v. *Jochim,*

99 Mich. 358, 58 N. W. 611, 613, 23 L. R. A. 699, 41 Am. St. Rep. 606, we find this: "A public office cannot be called 'property,' within the meaning of these constitutional provisions. If it could be, it would follow that every public officer, no matter how insignificant the office, would have a vested right to hold his office until the expiration of the term."

Other cases are cited which support some of the contentions for respondent, but I think that they are based upon unsound premises and that all can be distinguished from the case in judgment.

A Virginia case relied upon is *Edmiston* v. *Campbell* (1792), 1 Va. Cas. (3 Va.) 16. In that case Campbell, the defendant, had been appointed a justice of the peace in 1776. The General Assembly thereafter passed an act which empowered the Governor and council to remove a justice of the peace for misconduct, under which the defendant was removed. Thereafter, in 1787, there was a legislative act which declared that the former statute under which the defendant had been removed was unconstitutional, and so repealed it; whereupon defendant again began to exercise the powers of his office of justice of the peace. There was thereafter an action against Campbell to recover a statutory penalty for illegally acting as a justice, which resulted in favor of complainant, "if the law was for him." The general court, not being required as we are to write opinions, decided the case in these words only: "The law is for the defendant." It is at once observed that whatever plausible arguments may be based thereon, the case should not be construed to support the propositions contended for by the respondent. There the General Assembly itself repealed the act under which the defendant had been removed, declaring it unconstitutional, and this court merely construed the repealing act as sufficient to accomplish the purpose of the General Assembly.

That there have been differences of opinion among the courts is perfectly apparent, but I am of opinion that the

better reason clearly supports the conclusion that the power of removal for cause vested in an executive officer is not so essentially judicial in all of its aspects as to come within the constitutional inhibition providing for a separation and division of the essential powers of government.

In *Bland and Giles County Judge Case*, 33 Gratt. (74 Va.) 450, this court clearly recognized the manifest distinction, so frequently overlooked, between the lawful removal of an official, under express authority, and the forfeiture of an office for some cause, in this language: "An office is terminated *proprio vigore* by resignation, expiration of term and by removal by competent authority. But in other cases the office is not terminated *ipso facto* by the occurrence of the cause."

In *State* v. *Walbridge*, 119 Mo. 383, 24 S. W. 457, 460, 41 Am. St. Rep. 670, this view of such statutes—that is, those which do not authorize removal without notice, but do provide for removal and fail to provide specifically for notice—is expressed: "It is true that neither charter nor ordinance make any provision for the means whereby the amotion of an appointed officer is to be effected; but where a grant of power is given, all the means necessary to effectuate the power pass as incidents of the grant. * * *

"In the case presented, the power to amove the officer is 'for cause,' and no notice is mentioned as requisite to be given to the officer to be proceeded against. But the law, in accordance with the principles of justice—principles which are fundamental and eternal—will require that notice be given before any person be passed upon, either in person, estate, or any other matter or thing to which he is entitled; and though the statutes do not, in terms, require notice, the law will imply that notice was intended. *Laughlin* v. *Fairbanks*, 8 Mo. 370; *Wickham* v. *Page*, 49 Mo. 526; *Brown* v. *Weatherby*, 71 Mo. 152. And what the law will imply is as much part and parcel of a legislative enactment, as though set forth in terms. *State* v. *Board of Equalization*, 108 Mo. 235, 18 S. W. loc. cit. 784;

Sutherland on Stat. Construction, sec. 334, and cases cited."
12 Am. & Eng. Anno. Cas. 996.

Pertinent citations and quotations might be greatly multiplied, but to do so would only demonstrate the impossibility of reconciling the various expressions of the courts. The latest collection of these cases, as we are advised, is found in the note to *People ex rel. Johnson* v. *Coffey* (237 Mich. 591, 213 N. W. 460), 52 A. L. R. 7. The annotator summarizes his own conclusions (52 A. L. R. 32) thus: "(1) The question whether the Governor's decision is conclusive or subject to review by the courts is one depending to a considerable extent on constitutional and statutory provisions, since arbitrary power may be thereby conferred, and the matter left entirely in the Governor's discretion, in which case the questions discussed in the present annotation do not usually arise; (2) where the power of removal is given for cause or for reasons specified, the Governor's decision on disputed questions of fact is final as regards the facts, and cannot be reviewed by the courts, if there is some evidence to support them; (3) where the Governor assigns a legal cause for removal, the courts will not inquire into his motives, and at least will not go further than to determine whether there was some evidence substantially tending to support his conclusion; (4) the courts may determine the question whether the Governor had jurisdiction to remove the officer; (5) the question whether the cause assigned by the Governor for removal is a legal cause for which he is authorized to act is one which, according to the weight of authority, may be passed upon by the courts, going, it seems, to the question of jurisdiction, although there is also authority to the effect that the Governor need not assign any reason for his action in removing an officer; (6) the courts may review the action of the Governor in removing an officer in a clear case where he has acted arbitrarily or capriciously, though this is a delicate matter into which the courts obviously would go very reluctantly; and political reasons or considera-

tions cannot be a matter of judicial investigation; (7) the question of the form of the remedy is important, since the action by which it is sought to review the act of the Governor in removing the officer may fail on the ground that that officer is not subject to the particular relief sought, such as mandamus; and, although there are authorities holding that *certiorari* will lie to review the decision of the Governor in removing an officer, this view has been rejected by other courts."

Out of this Babel comes the confusion of tongues, many voices that enlighten and many that darken counsel—words wise, and otherwise.

We should then leave the subtleties of judicial expressions in other cases involving different facts and consider the realities of this case. The power conferred by the statute is great because the evil to be corrected is also great, but the power granted is neither unlimited nor arbitrary. No arbitrary exercise of the power of removal is authorized by the statute, nor has there been any arbitrary exercise of it against Weston by the Governor; nor does the statute either deny or attempt to prohibit the exercise by the courts of any judicial power previously existing. If and when a Governor shall abuse the limited power granted by this statute, the courts can and should correct the abuse and will need no legislative authority therefor. Whenever a county treasurer who is not in default is removed without any notice, and a petition for mandamus is presented to a court asking that the Governor's appointee shall have its process to enforce his occupancy of the office, then the court should certainly exercise its discretion to refuse the mandamus and leave the parties to assert their conflicting rights in such other method as may be provided by law. There are two other remedies—one open to the public under Code, section 2705, known as the "ouster law," and the other open to Weston by writ of *quo warranto* under Code, section 5841.

That too many county treasurers have been negligent, inefficient, or criminal, in the discharge of their duties to collect,

conserve and have the public revenues in hand ready for the public use, as required by law, is a matter of common knowledge. That the ordinary processes of courts for the enforcement of their legal obligations and imperative official duties as to the collection and custody of the public funds are quite inefficient is illustrated by two recent cases decided by this court.

In *Clevinger* v. *County School Board,* 139 Va. 444, 124 S. E. 440, the county treasurer retired from office December 31, 1919. After a prolonged litigation for the settlement of his accounts, in which he was found to owe the county school board a considerable sum of money, the case finally reached this court, and was decided September 18, 1924, so that for nearly five years the local public schools were conducted without the benefit of the funds contributed by the taxpayers for their support.

In *Stinson* v. *Board of Supervisors,* 153 Va. 362, 149 S. E. 531, the county treasurer was found to be in default before his term had expired. Six months before the expiration of his term, in June, 1927, the board of supervisors filed a bill praying for a full accounting and recovery against the county treasurer and his sureties. It was found that as of August 29, 1927, the amount due was $116,290.82. The treasurer, however, continued in office and by the time his term ended, Decemebr 31, 1927, his default had increased to $136,493.75. All of this large amount collected from taxpayers for public purposes was withheld for more than two years. The suit was prosecuted with extreme diligence, but it took nearly two years to secure final judgment against the treasurer and his sureties.

It was because of the probability of the repetition of such public injuries that the General Assembly adopted the statute under review. That its purpose was wise and in the public interest is manifest, and that this legislative expression should be made effective, if not prohibited by the Constitution, must be apparent to all.

Said John Marshall: "Let the end be legitimate, let it be within the scope of the Constitution; and all means which are appropriate, which are clearly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the Constitution, are constitutional."

It is impossible to read the stipulation as to the facts without perceiving that, for the purposes of this proceeding, it is conceded that the Auditor of Public Accounts, a sworn public official, in the performance of the duties imposed upon him by law, found that respondent, Weston, was on May 17, 1930, indebted to the county of Lee in the sum of more than ninety-nine thousand dollars, and on the same date owed to the State of Virginia $4,399.09, for which indebtedness he could only show in cash or cash items the sum of $8,127.02. He was not, however, then removed. A subsequent official audit of his accounts showed that as of October 22, 1930, he owed the county of.Lee more than ninety-nine thousand dollars, and that on that date he had in cash or cash items only the sum of $7,022.68. He certainly must be presumed to have had notice of these official examinations and of the results shown thereby.

The demurrer admits, for the purposes of this case, the allegations of the petition, and does not controvert the statements of the Governor, filed as exhibits with the petition, which show that there had been two official audits of his accounts showing his dereliction, and also that Weston had been afforded ample time in which to disprove the correctness of the audits and had failed to do so, all of which necessarily implies notice, opportunity and failure to discredit the evidence of default; and he was not suspended until November 29, 1930.

These being the facts, we are asked to refuse to co-operate with the General Assembly and the executive, and so defeat their commendable efforts to enforce this and other statutes, upon a fanciful construction of the Constitution which has

been frequently repudiated. I repeat, the General Assembly did not vest the Governor with any arbitrary or unlimited power under this statute. On the contrary, only with a necessary, natural, limited and proper executive power to prevent the continuance of a public wrong by suspending an officer for dereliction in his duty, and the Governor has not undertaken to exercise the power so conferred in an arbitrary manner. The statute regulating mandamus (Code, ch. 239) authorizes the respondent to raise issues upon the facts alleged and to take depositions to establish his contentions. Had this respondent taken advantage of this his latest opportunity to exculpate himself, and had he averred and shown any fair reason to doubt that he had failed to discharge his official duties, certainly I should have regarded this to be a sound appeal to our judicial discretion and would have acquiesced in refusing the mandamus. That, however, is not the case before us.

My conclusion is that the statute is a reasonable exercise of legislative power, reserved by Constitution, section 63, and expressed by Constitution, section 56; that it confers executive power only, and for the purpose of correcting a crying public evil; that it does not in any respect limit the appropriate exercise of any judicial power; and that certainly the petitioner has the *prima facie* right to exercise the powers and perform the duties of the office as to which the respondent has been derelict. I think, therefore, that the mandamus should be issued.

Since writing this opinion, which is longer than is necessary and was written in the vain hope that it would convince the majority, I have read the opinions which are approved by the majority, taking the contrary view.

I feel that, lest I be misunderstood, some reference should be made to the citation therein from 2 Minor's Inst. (3d ed.), p. 33, and the cases cited in that connection. I am in perfect accord with all of those cases. *Maddox* v. *Ewell,* 2 Va. Cas.

(4 Va.) 59, is typical. There Alexander, a justice of the peace, had accepted an office which it was contended vacated his office as justice of the peace, and hence made his certificate thereafter as justice a nullity. Statutes like that differ very materially from the statute here involved. In such cases—that is, cases which provide that in certain events offices shall become vacant—must be construed by the courts. Such statutes do not purport to vest any executive official with power to suspend an officer and appoint his successor. The office in such case is vacated by force of the statute and not by authority of the court, and there is no provision for a successor. The difference between such statutes and the one here under review seems to me quite apparent, and so I regard such cases as affording slight aid in the determination of the questions here presented. The purpose of this statute is to provide a summary remedy to correct public wrongs, and as I understand the majority have concluded that such a remedy cannot be accomplished by any statute, and that in every case a formal judicial procedure is necessary. Of course, this entails the customary delays incident to such proceedings. As it seems to me, this is a backward step which denies essential governmental powers and seriously hampers the legislative and executive departments in their efforts to provide for orderly government.

GREGORY and BROWNING, JJ., concur in dissenting opinion of PRENTIS, C. J.